# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

_____

| | |
|---|---|
| **A.H,** ) | |
| **A minor Student,** ) | |
| **By and Through Her Parents,** ) | No. _____ |
| **A.H. and D.H.;** ) | |
| ) | |
| **Plaintiffs.** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **CLARKSVILLE-MONTGOMERY** ) | |
| **COUNTY SCHOOL SYSTEM** ) | |
| ) | |
| **and** ) | |
| ) | |
| **TENNESSEE DEPARTMENT OF** ) | |
| **EDUCATION; AND TENNESSEE** ) | |
| **STATE BOARD OF EDUCATION** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

_____

## COMPLAINT
_____

**COMES NOW, THE PLAINTIFFS, A.H.**, by and through her parents, **A.H. and D.H.** They respectfully show:

### I. PRELIMINARY STATEMENT

1. This case involves *preschool* "Pilot Programs" for inclusion and disagreement between the local educational authority (Clarksville-Montgomery County School System) and the state educational authority (Tennessee Department of Education) about whether these *systems* comply with federal law. Because the dispute is not simply about A.H.'s

individualized needs, but about placement systems for *all* preschool students with disabilities under federal law, this action in District Court is appropriate.

2. Federal law, including IDEA, requires school systems to educate preschool children with disabilities in their least restrictive environment with access to non-disabled peers to the maximum extent appropriate. However, CMCSS does not have *any* general education classrooms for students beginning at age 3. Rather, it only has *special education* classrooms solely for children with disabilities.

3. For children age 4, CMCSS does have *limited* classrooms based upon strict low-income eligibility requirements per a state law. Tenn. Code Ann. §49-6-101(f)(1)(B). Thus, for children like A.H., who do not meet the limited income requirements, the special education classrooms remain their only option, thus violating the least restrictive mandate and integration mandates of federal law.

4. Faced with this known situation, CMCSS developed two Pilot Programs. The first Pilot Program, in May of 2018, consisted of CMCSS using four non-disabled kids to "volunteer" to spend Tuesdays and Thursdays with the children with disabilities in a special education classroom at East Montgomery Elementary School. There, they would all be taught by the special education teacher. No additional days of the week could be added to this Pilot Program. Plaintiffs rejected this Pilot Program as not meeting A.H.'s least restrictive environment.

5. Pilot Program 2 was developed in August of 2018. It consists of CMCSS placing non-disabled peers at Bethlehem Elementary School into a special education classroom with children with disabilities for up to three hours per day for two days per week, on Tuesdays and Thursdays. The classroom is still also being taught by a special education teacher and designated as a special education setting. Pilot Program 2 is the subject of

this action. CMCSS contends it is lawful while TDOE's preschool representative, and Plaintiffs, contend it is not. Plaintiffs contend that Pilot Program 2 is *not* individualized based upon children's actual needs, but is rather a blanket program based upon funding considerations.

## II. PLAINTIFFS

6. A.H. is a minor child with a disability who is educated in Montgomery County, Tennessee. She and her parents, A.H. and D.H., reside at 3766 Tradewinds Terrace, Clarksville, TN 37040.

7. Initials are used in this Complaint to preserve the confidentiality of sensitive medical, educational, and disability-related information under the IDEA and the Family Educational Rights and Privacy Act of 1974 (FERPA).

## III. DEFENDANTS

8. Clarksville-Montgomery County School Systems (CMCSS) is the Local Education Agency (LEA) and receives federal financial assistance. CMCSS operates the local schools in Montgomery County, Tennessee.

9. CMCSS is one of the largest school districts in the state of Tennessee, serving approximately 35, 238 students in the 2017-2018 school year. CMCSS, Growth & Data, *available at* https://www.cmcss.net/ (last visited Aug. 29, 2018).

10. The Tennessee Department of Education (TDOE) is the "State Education Agency" (SEA), an arm of the state of Tennessee, which is legally responsible for ensuring that a free appropriate education (FAPE) is provided to all students in the state of Tennessee. An "SEA" includes a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform

3

Case 3:18-cv-00812   Document 1   Filed 08/29/18   Page 3 of 19 PageID #: 3

a service function for, public elementary or secondary schools in a city, township, school district, or other political subdivision of a State[.]  20 U.S.C. §1412(a)(1).

11.     The Tennessee State Board of Education (TSBOE) is responsible for implementing policies relating to educating preschool children, including that students with disabilities receive a free appropriate public education (FAPE) in their least restrictive environment (LRE).  *See* Tennessee Rules of State Board of Education, Chapter 0520-01-09, *et. seq.*; Tennessee State Board of Education, Early Childhood Education, Policy 3.100.

12.     TDOE and TSBOE directly or indirectly accept federal funding or assistance within the meaning of Section 504.

### IV.     JURISDICTION

13.     This Court has jurisdiction under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. 1415(e)(2), and its state counterpart, Tenn Comp. R. & Reg § 0520-01-09; Title II of the Americans with Disabilities Act, 42 U.S.C. §12101 *et. seq.*; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794.

14.     Jurisdiction is also proper because this case involves "systemic" issues relating to two Pilot Programs applicable to all three-year old preschool children and all four-year old and up non-income-qualifying preschool children with disabilities.  These Pilot Programs violate the applicable laws for *all* such children with disabilities, not simply A.H.  A.H. is negatively affected by Pilot Program 2 as it CMCSS' current proposal, but it is the Programs themselves that must be stricken and replaced.

15.     In fact, upon information and belief, the programs were created by the LEA for cost-saving reasons (a decision the SEA does not endorse, but has not fixed).  Thus, the wrongs being alleged are wrongs for which District Courts are suited to correct, and for

which state hearing offers are not. Moreover, cases resting upon cost-based decision-making are appropriate for judicial intervention:

> [This] is precisely the sort of situation where judicial intervention is necessary to fulfill congressional intent and serve the public interest. Left to its own devices, a school system is likely to choose the educational option that will help it balance its budget, even if the end result of the system's indifference to a child's individual potential is a greater expense to society as a whole.

*Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 864-65 (6th Cir. Tenn. 2004).

## V. VENUE

16. Venue is proper under 28 U.S.C. §1391 because TDOE and TSBOE are the State Education Agency (SEA) which is located in Nashville, Tennessee and the acts giving rise to the allegations in this lawsuit occurred within the CMCSS which is also within the Middle District.

## VI. FACTS

17. A.H. has Down syndrome, an intellectual disability causing developmental delay. There is no dispute she is eligible for special education services under IDEA. Additionally, due to her substantial limitations in thinking, learning and communicating, she is eligible for reasonable accommodations and meaningful access to educational programming and services under Section 504 and ADA.

18. In May of 2018, CMCSS met with A.H.'s parents prior to her third birthday to create an IEP for the upcoming 2018-2019 school year. CMCSS' IEP team determined that A.H.'s least restrictive environment would be a general education preschool classroom with typically developing peers.[1]

---

[1] CMCSS' May 16, 2018 proposed IEP states in the LRE section that, "A.H. will participate with her typically developing peers during all activities except when she is pulled out to receive her direct language services in a special education setting."

5

19. But CMCSS had a problem with respect to providing a general education classroom with non-disabled peers: A.H.'s zoned school, Oakland Elementary School, did not *have* a general education preschool classroom. It only had a special education classroom comprised solely of children with disabilities ages 3 to 5.

### A. THE FIRST PILOT PROGRAM

20. To address the problem, CMCSS advised A.H.'s parents that it was developing a "Pilot program" at another school, East Montgomery Elementary, that would suit A.H.'s needs.

21. The Pilot Program consisted of four kids without disabilities who would "volunteer" to be brought into a special education classroom. These four kids would volunteer twice a week (Tuesdays and Thursdays). CMCSS contended this Pilot Program would result in "inclusion" because, with the volunteers, the classroom would be half kids with disabilities, and half kids without disabilities, a 50/50 ratio.

22. A.H.'s parents inquired further. They learned the Pilot Program was to consist of four kids without disabilities who were children of CMCSS' staff. CMCSS informed A.H.'s parents that these four kids might not *always* attend on Tuesdays and Thursdays, but it would try to keep the ratio as close to 50/50 as possible.

23. More importantly, CMCSS also advised A.H.'s parents that the classroom for the Pilot Program would still be a *special education* setting, not a general education setting, because it would be staffed by one special education teacher. That teacher would teach all of the students on Tuesdays and Thursdays, and then teach only students with disabilities on Monday, Wednesday, and Friday.

24. CMCSS also explained that the Pilot Program's offering of a maximum of two (2) days per week of "inclusion" on Tuesday and Thursday was an across-the-board rule for

the Pilot Program. If A.H. required additional days of preschool, she would receive those in a preschool classroom comprised solely of children with disabilities.

25. A.H.'s parents also learned that the Pilot Program at East Montgomery Elementary School is located across the county from them, 40 minutes from A.H.'s home. CMCSS advised that any transportation issues must be borne by the parents, not CMCSS.

26. A.H.'s parents believed the Pilot Program was not "inclusion," it was not individualized to A.H., and it was not consistent with the IEP Team's findings. Yet CMCSS did not offer any other alternative, including a private mainstream daycare facility within Montgomery County, Headstart, or other community program.

27. A.H.'s mother turned to TDOE. TDOE has a "Special Education IDEA 619 Consultant," Dolly Gerragano, who works with preschool children with disabilities in connection with the IDEA. "IDEA 619" refers to the section of the IDEA governing special education and services for children ages 3 to 5.

28. A.H.'s mother discussed the Pilot Program at East Montgomery Elementary and TDOE, through Ms. Gerragano, responded that the Pilot Program was not legally sufficient. Ms. Gerragano stated that TDOE has informed CMCSS "for years" that their district was not compliant with IDEA requirements for providing the full continuum of placements for children with disabilities ages 3 to 5 within their district. She said it was "only a matter of time" before CMCSS would face legal ramifications for not fulfilling this responsibility.

29. For the Pilot Program to pass muster, Ms. Gerragano explained that the 50/50 ratio was not only necessary, but also that the classroom would need to be considered a general education setting, one taught by a licensed general education teacher. A special

7

education teacher or other support professionals could be used to provide additional push in support as needed.

30. Upon information and belief, TDOE also spoke to CMCSS about the Pilot Program. CMCSS' Director of Special Populations, Taylia A. Griffith, advised A.H.'s mother that, yes, a general education teacher was necessary, which CMCSSS did not have: "If the school district has an inclusive classroom (i.e., 50 percent or more of children enrolled are typically developing peers) two days a week, the classroom would have to be taught by a teacher with a regular education endorsement appropriate for preschool. There are no regular education teachers serving 3-year olds in the public school setting."

31. On June 4, 2018, A.H.'s mother rejected the Pilot Program for A.H. She stated in writing that it was not A.H.'s LRE because it was still designated as a special education setting on her IEP, and it was not staffed with a general education teacher. A.H.'s mother additionally expressed that the Pilot Program was "further limiting in the fact that A.H. would only have access to typically developing peers two days a week. And if A.H. needed more days during the week she would end up in a classroom where everyone has an IEP, just in order to have an extra day of school."

32. While the Pilot Program proposed in the May 16, 2018 IEP was *not* implemented with respect to A.H. because her parents objected that it did not meet her LRE, upon information and belief, it is in effect for other children with disabilities within CMCSS. For A.H., a second Pilot Program ("Pilot Program 2") was created.

### B. PILOT PROGRAM 2

33. In August of 2018, CMCSS stated to A.H.'s mother that it would *not* provide a general education teacher for the three-year-old preschool classroom. Ultimately, the reason had nothing to do with A.H.'s individualized needs or the specifics of her own IEP,

but everything to do with funding sources. CMCSS' Director of Special Populations explained that *a general education teacher's salary* would have to come from CMCSS' budget, and not from state and federal IDEA funds, which CMCSS was unwilling to do.

34. On August 15, 2018, at an IEP meeting, CMCSS announced Pilot Program 2 to A.H.'s mother. It acknowledged, "We don't have a general education setting for a three-year-old. If we did, we wouldn't have this problem."

35. Pilot Program 2 involved St. Bethlehem Elementary School instead of East Montgomery Elementary. St. Bethlehem had two developmental (special education) preschool classes for children with disabilities ages 3 to 5, along with two voluntary (general education) preschool classes for typical children who are age 4 *and* meet a low-income threshold.

36. Under Pilot Program 2, A.H. would be placed into one of the two developmental (special education) preschool classes at St. Bethlehem. This time, CMCSS would select some typically-developing four-year-olds from the general education classroom and put them into the special education classroom for at least three (3) hours per day.

37. Under Pilot Program 2, CMCSS sent home a parent permission letter to allow the four-year-olds to be placed in the special education classroom for up to three (3) hours per week.

38. Under Pilot Program 2, like Pilot Program 1, the typically developing peers were offered to appear only twice a week, again on Tuesday and Thursday. And again, Pilot Program 2 would be considered a special education setting taught by a special education teacher.

39. Under Pilot Program 2, the four-year-old typical peers would appear for at least three hours a day, at random times, with no certainty of when this would occur. CMCSS intended to replicate the same program for 2019-2020 as for school year 2018-2019.

40. Using Pilot Program 2, CMCSS' wrote an August 15, 2018 IEP for A.H. stating that she would receive "peer-modeled social/adaptive support" provided by a preschool special education teacher two (2) times per week for 5.5 hours per session in a special education setting. On the "LRE and General Education" page of the August 15, 2018 proposed IEP, CMCSS referred to Pilot Program 2 as "reverse mainstreaming," while still noting the paucity of hours for actual inclusion.

41. On August 15, 2018, CMCSS issued a Prior Written Notice (PWN)[2] which states: "CMCSS proposed the option of sending A.H. to the developmental preschool program at St. Bethlehem elementary school. This classroom is part of a 'student swap' where 50% of the students in the classroom are typically developing peers for at least three hours during the school day."

42. That same day, August 15, 2018, TDOE again advised A.H.'s mother that the proposal was legally insufficient. Once again, Ms. Gerregano, the IDEA 619 Consultant, responded:

> Reverse mainstreaming —as it is typically called — is a classroom that has mostly children with disabilities and a few/some children without disabilities. I think this is what CMCSS is proposing. **This type of classroom is not a regular education classroom and is not by today's standards considered inclusion. Your original draft IEP stated that the Least Restrictive Environment for A.H. is a regular early education childhood classroom. Since CMCSS has already agreed to this LRE, I'm not sure how they can now want to place A.H. in a special education setting as is listed on the current draft IEP.** I believe they would need some data or other strong

---

[2] Prior Written Notice is a right afforded to parents so they can challenge the proposed placement by the school system.

> documentation to change her LRE to a more restrictive placement. I also encourage you to speak to Steve Sparks (steve.sparks@tn.gov) to learn more about the legal issues and the procedural safeguards you have available.
>
> To be an inclusive regular early childhood classroom, the classroom must have an enrollment of at least 50 percent children who do not have a disability (no IEP) **and the teacher must be properly endorsed to teach regular early childhood**.

43. Because Pilot Program 2 is a blanket program inconsistent with the law, and violates A.H.'s rights, and A.H.'s parents continued to receive conflicting responses from the LEA, CMCSS, and the SEA, TDOE/TSBOE, this legal action is necessary.

44. Parents of children with disabilities are not charged with fixing the *system;* the LEA must do so and, if it will not or cannot, the SEA must do so. Neither occurred here.

### VII. LEGAL CLAIMS

45. Plaintiffs bring claims of failure to provide a least restrictive environment and/or integrate preschool students with disabilities under IDEA; Section 504; and Title II of the Americans with Disabilities Act. Plaintiffs received consistently conflicting information between the LEA and the SEA, stymying their daughter's education in a least restrictive environment (and that of similarly situated children with special needs).

46. **IDEA and Preschool.** The IDEA requires all students to be educated in their *least restrictive environment.* 20 U.S.C. §1412(a)(5). Therefore, "[t]o the maximum extent appropriate children with disabilities…are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular education environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C.§1412(a)(5); 34 C.F.R. § 300.116. Further, IDEA requires that "unless the IEP of a child with disability

11

requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled," and that in any event, the "child's placement is a close as possible to the child's home." 34 C.F.R. § 300.116.

48. The LRE requirements apply to preschool too. 20 U.S.C. § 1412(a)(1) (applicable to all children with disabilities between the ages of 3 and 21). The commentary to Section 300.116 states that the requirements for determining the educational placement of a child with a disability **include preschool children with disabilities** and that such decisions must be made in conformity with the LRE provisions in 34 C.F.R. §§ 300.114 through 300.118. This includes ensuring that a full continuum of placements is available to meet the needs of children with disabilities.

48. For local school districts who, like CMCSS, do not offer or offer only a limited range of public preschool programs, the LRE requirements must be met through *different methods* such as providing opportunities in preschool programs operated by other public agencies such as Head Start or community-based care; enrolling preschool children in private preschool programs; locating classes for them in regular public elementary schools; or providing home-based services. *See* Commentary to 34 C.F.R. § 300.116. None of these has occurred at CMCSS.

49. In September 2015, the United States Department of Education and the U.S. Department of Health and Human Services (HHS) issued a policy statement on promoting inclusion in early childhood programs to set a vision on this issue and provide recommendations to States, local educational agencies (LEAs), schools, and public and private early childhood programs.

50. On January 9, 2017, the U.S. Department of Education issued a "Dear Colleague" letter reinforcing that "[d]espite the expansion of early childhood programs, there has not

12

yet been a proportionate expansion of inclusive early learning opportunities for young children with disabilities." Accordingly, the Office of Special Education Programs (OSEP) updated the February 29, 2012, Dear Colleague Letter (DCL) to "reaffirm a commitment to inclusive preschool education programs for children with disabilities and to reiterate that the least restrictive environment (LRE) requirements in section 612(a)(5) of the Individuals with Disabilities are fully applicable to the placement of preschool children with disabilities."

51. TDOE and TSBOE are legally responsible for ensuring that a FAPE is provided to all students in the state of Tennessee in their LRE. Where the local education agency (LEA) refuses, or is unable to provide FAPE in their LRE, as the case is here, then the State is responsible for ensuring it.

52. While TDOE and TSBOE, through its IDEA 619 Consultant, did not *endorse* Pilot Program 2 to A.H.'s mother, neither did it stop it.

53. Under IDEA, the State Educational Agency must "establish[] and maintain[] qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities." 20 U.S.C. § 1412(a)(14)(A).

54. CMCSS requires technical assistance from TDOE and TSBOE. The State Educational Agency must provide technical assistance to administrators in all public agencies. 34 C.F.R. § 300.119.

55. CMCSS requires training with respect to educating children with disabilities in their Least Restrictive Environment. With respect to the Least Restrictive Environment mandate, each State Educational Agency "must carry out activities to ensure that

teachers and administrators in all public agencies (a) are fully informed about their responsibilities for implementing Sec. 300.114 [("General LRE Requirements")]; and (b) are provided with technical assistance and training necessary to assist them in this effort." 34 C.F.R. § 300.119.

56. Further, CMCSS requires training about an "appropriate" education for students with disabilities. The State Educational Agency is "responsible for general supervision" of education in the state. 20 U.S.C. § 1412(a)(11). Specifically, the State Educational Agency is responsible for ensuring that the requirements of Section 1412 of IDEA are met, including the right to a free appropriate public education in the least restrictive environment. 20 U.S.C. § 1412(a)(11)(A)(i).

57. In addition, the State Educational Agency is responsible for ensuring that "all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency – (I) are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities; and (II) meet the educational standards of the State educational agency." 20 U.S.C. § 1412(a)(11)(A)(ii).

58. The State Educational Agency must "establish[] goals for the performance of children with disabilities in the State that—(i) promote the purposes of [Section 1412 of IDEA]," including the right to a free appropriate public education in the least restrictive environment. 20 U.S.C. § 1412(a)(15)(A).

59. The State is required to "monitor implementation of," and "enforce," IDEA, 20 U.S.C. § 1416(a)(1)(C), with the "[p]rovision of a free appropriate public education in the least restrictive environment" being deemed a "monitoring priorit[y]" that requires the collection of data using "quantifiable . . . and . . . qualitative indicators . . . to adequately

measure performance," 20 U.S.C. § 1416(a)(3), with "measurable and rigorous targets for the indicators," 20 U.S.C. § 1416(b)(2)(A). The targets must be used by the State to "analyze the performance of each local educational agency in the State in implementing [IDEA]." 20 U.S.C. § 1416(b)(2)(C)(i).

60. Another "monitoring priorit[y]" for the State Educational Agency is its exercise of its "general supervisory authority" which includes "effective monitoring," 20 U.S.C. § 1416(a)(3)(B). The State Education Agency is to focus its monitoring on "improving educational results and functional outcomes for all children with disabilities." 20 U.S.C. § 1416(a)(2).

61. Defendants are jointly liable for the violation of the LRE requirements for preschool students and must be enjoined from continuing Pilot Program 2.

62. **Title II of the ADA**. As Congress stated in its findings and purposes of the Americans with Disabilities Act: "[H]istorically, society has tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. §12101(a)(2). Thus, under Title II of the Americans with Disabilities Act, with amendments, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

63. Defendants have violated Title II by unnecessarily segregating persons because of their disabilities (i.e. grouping children with disabilities ages 3 to 5 who require a lesser restrictive setting into developmental special education preschool classrooms comprised solely of children with disabilities without access to general education preschool

15

classrooms provided to children ages four and up without disabilities). *Olmstead v. L.C.,* 527 U.S. 581, 600 (1999).

64. Defendants further violated the ADA by failing to reasonably modify the State's policies, practices, and procedures to avoid such discrimination and unnecessary segregation, 42 U.S.C. §12132, as well as by providing unequal educational opportunities to A.H. (and other preschool children with disabilities) by failing to modify policies, practices, and procedures to avoid discrimination (i.e. failing to modify policies and practices to allow inclusion of children with disabilities who require a lesser restrictive placement into the State's voluntary (general education) preschool programs). 28 C.R.F. §35.130(b)(1)(i)-(iii), (vii).

65. Under Title II of the ADA, Defendants have allowed the unnecessary segregation of persons because of their disabilities. *Olmstead v. L.C.,* 527 U.S. 581, 600 (1999). And they have done so knowingly, willfully, or intentionally.

66. **Section 504**. Under the Rehabilitation Act, 29 U.S.C. §701, et. seq., Congress found that disability is a natural part of the human experience and in no way diminishes the right of individuals to enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society, 29 U.S.C. §701(a)(3)(F). The purpose of Section 504 of the Rehabilitation Act is to "empower individuals with disabilities to maximize … inclusion and integration into society." 29 U.S.C. §701(b)(1). For schools, Section 504 also contains a least restrictive environment obligation. 34 C.F.R. §104.34(a).

67. TDOE and TSBOE have numerous supervision and monitoring responsibilities to ensure that the aforementioned least restrictive environment obligations are met by local school districts. Preschool children with disabilities who require a general education

16

preschool setting in order to receive a FAPE in their LRE, including A.H., have as TDOE recognized, "for years" not been offered an appropriate education in their LRE due to the longstanding lack of diligence of TDOE and TSBOE and breach of duties.

68. And, under Section 504, despite receiving federal funds premises on non-segregation, Defendants have *not* ensured that the purpose of Section 504 is being met: "empower[ing] individuals with disabilities to maximize ... inclusion and integration into society." 29 U.S.C. §701(b)(1).

69. Defendants have breached the aforesaid obligations.

70. A.H. has been harmed educationally by Defendants' Pilot Program 2 and similarly failed experiments in that she has lost the opportunity for educational advancement in a general education preschool classroom and requires compensatory services, private placement, and/or compensatory damages.

**WHEREFORE, premises considered**, Plaintiffs request process be served, that Defendants be compelled to timely answer, that Plaintiffs be awarded appropriate injunctive and equitable relief or compensatory damages relief to include:

A. Grant judgment in favor of the Plaintiffs on their Complaint and declare that Defendant has violated IDEA, Title II of the ADA, and Section 504 of the Rehabilitation Act of 1973;

B. Issue a Declaratory Judgment on behalf of Plaintiffs declaring the actions, policies, and practices as alleged herein violate the IDEA; Section 504; and Title II of the ADA;

C. Direct Defendants to provide or fund the staffing supports designed to allow students to be placed with non-disabled peers, along with training and

resources on determining least restrictive placements and the integration mandate;

D. Direct Defendants to provide compensatory services, private placement, or compensatory damages;

E. Direct Defendants to provide or require use of inclusion specialists at the local school districts;

F. As appropriate, appoint an independent monitor to oversee Defendants' compliance with the Court's order;

G. Provide funding to the local school district, as needed, to comply with this order;

H. Award Plaintiffs their costs and attorneys fees; and

I. Grant any such other and further relief, at law or equity, which may be appropriate.

Respectfully Submitted,

**THE SALONUS FIRM, PLC**

s/ Jessica F. Salonus_____
Jessica F. Salonus (TN Bar No. 28158)
101 North Highland
Jackson, TN 38301
Telephone: 731-664-1340
Facsimile: 731-664-1540
jsalonus@gilbertfirm.com

**&**

**GILBERT RUSSELL McWHERTER SCOTT BOBBITT, PLC**

/s Justin S. Gilbert_____
Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 504 Chattanooga, TN 37402
Telephone: 423-499-3044
Facsimile: 731-664-1540
jgilbert@gilbertfirm.com

**ATTORNEYS FOR PLAINTIFFS**

19

Case 3:18-cv-00812   Document 1   Filed 08/29/18   Page 19 of 19 PageID #: 19