# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| A.H., a minor student, by and through<br>her parents, A.H. and D.H., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 3:18-cv-00812** |
| | ) | **Judge Aleta A. Trauger** |
| CLARKSVILLE-MONTGOMERY | ) | |
| COUNTY SCHOOL SYSTEM; | ) | |
| TENNESSEE DEPARTMENT OF; | ) | |
| EDUCATION and TENNESSEE STATE | ) | |
| BOARD OF EDUCATION, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

The Clarksville/Montgomery County School System ("CMCSS") has filed a Motion to

Dismiss (Docket No. 9), to which A.H., by and through her parents A.H. and D.H., has filed a

Response (Docket No. 18), and CMCSS has filed a Reply (Docket No. 26). The Tennessee

Department of Education ("TDOE") and Tennessee State Board of Education (collectively, "State

Defendants") have also filed a Motion to Dismiss (Docket No. 13), to which A.H. has filed a

Response (Docket No. 21), and the State Defendants have filed a Reply (Docket No. 28). For the

reasons stated herein, both motions will be denied.

## I. BACKGROUND[1]

### A. The IDEA and Pre-Kindergarten Students in Tennessee

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*,

"offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public

---

[1] Except where otherwise indicated, the facts set forth are taken from A.H.'s Complaint (Docket No. 1) and are accepted as true for the purposes of the Motions to Dismiss.

education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 748 (2017) (citing 20 U.S.C. §§ 1401(3)(A)(i), 1412(a)(1)(A)). Tennessee has participated in the IDEA or its similar predecessor program for decades. *See, e.g., Clevenger v. Oak Ridge Sch. Bd.*, 573 F. Supp. 349, 349 (E.D. Tenn. 1983) (applying Act's predecessor in Tennessee), *rev'd on other grounds*, 744 F.2d 514 (6th Cir. 1984).

"[T]he IDEA gives the 'primary responsibility . . . for choosing the educational method most suitable to the child's needs . . . to state and local educational agencies in cooperation with the parents or guardian of the child." *Long v. Dawson Springs Indep. Sch. Dist.*, 197 F. App'x 427, 433–34 (6th Cir. 2006) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982)). At the heart of this collaborative process is the child's individualized education program, or "IEP." "The IDEA establishes procedures by which school officials, parents, and the student can collaborate to create an IEP" that takes into account the unique needs of the child, the special education expertise of the educators, and the voice of the child's parents or guardians as advocates for the child's best interests and educational needs. *Id.* at 432 (citing 20 U.S.C. §§ 1401(11), 1414(d); *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 368 (1985)). "The IDEA also provides for administrative procedures to resolve disputes when the people involved in the creation of an IEP are not able to agree on its substance." *Id.* (citing 20 U.S.C. § 1415(b)).

One of the issues typically addressed in an IEP is how to provide the child special education and related services in the least restrictive environment, or "LRE," appropriate to her needs. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(IV)(cc), (V) (requiring discussion of LRE issues in IEP). The IDEA requires that, "[t]o the maximum extent appropriate, children with disabilities . . . [be] educated

with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occur[] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5). Broadly speaking, this requirement results in a policy of educating disabled students, whenever possible and appropriate, alongside non-disabled students in the state's system of general education public schools,[2] although there are also IDEA students who receive their special education and related services in private and home settings. *See L.H. v. Hamilton Cty. Dep't of Educ.*, 900 F.3d 779, 799 (6th Cir. 2018) (holding that parents were entitled, under the IDEA, to reimbursement for cost of private school).

Under the IDEA, the State of Tennessee's obligation to provide a FAPE extends to "all children with disabilities residing in the State between the ages of 3 and 21, inclusive." 20 U.S.C. § 1412(a). In its documentation requesting federal IDEA funds, Tennessee has assured federal authorities that it would comply with that obligation, including the identified age range. *See, e.g.*, Letter from Ruth E. Ryder, Acting Director, Office of Special Education Programs, to Candice McQueen, Commissioner, TDOE (July 1, 2018), encl. A at II-1[3] (providing assurance that a FAPE will be provided to all children with disabilities from age 3 to age 21). Like many states, however, Tennessee does not provide universal public education for pre-kindergarten-aged children. Instead, Tennessee permits, but does not require, local education agencies ("LEAs") to operate preschools for "at-risk" four-year-olds. Tenn. Code Ann §§ 49-6-103, -104. Although "LEAs may apply to the [TDOE] for funding" for an authorized pre-kindergarten program, Tenn. Code Ann. § 49-6-

---

[2] *Cf.* Tenn. Const. art. XI, § 12 (requiring the Tennessee General Assembly to "provide for the maintenance, support and eligibility standards of a system of free public schools").

[3] Available at https://www2.ed.gov/fund/data/award/idea/2018partb/tn-enclosurea-2018b.pdf.

105(a), the state's statutes emphasize that "[i]mplementation of these programs by LEAs shall be voluntary," Tenn. Code Ann. § 49-6-103(c). Accordingly, a preschool-aged, IDEA-eligible child in Tennessee may find herself in a school district or zone where there is no public general education preschool in which she can participate alongside non-disabled peers.

**B. A.H.'s Attempts to Attend Preschool in an Appropriate LRE**

A.H. is a child with Down syndrome who lives within the territorial bounds of CMCSS. As of May 2018, she was two years old. (Docket No. 1 ¶¶ 17–18.) With their daughter's third birthday quickly approaching, A.H.'s parents met with CMCSS officials to begin work on her initial IEP. A.H.'s IEP team determined that, if possible, her LRE would be in a general education preschool alongside non-disabled peers, with A.H. being pulled out of the general education environment only to the extent necessary for her to receive direct language services in a special education setting. (Docket No. 1 ¶ 18 & n.1.)

The elementary school for which A.H. was zoned, Oakland Elementary, had no general education preschool classrooms. Consistently with the state's IDEA obligations, Oakland Elementary did have a special education classroom for children ages three to five, funded, presumably, through the IDEA's preschool grant program. *See* 20 U.S.C. § 1419. A.H.'s parents objected, however, to A.H.'s being instructed in a special education-only classroom, noting the IEP team's recommendation. CMCSS proposed enrolling A.H. in a "Pilot Program" being operated at another school in the district, East Montgomery Elementary. (*Id.* ¶¶ 19–20.) The Pilot Program, like the classes at Oakland Elementary, was structured around a classroom consisting only of special education students and staffed only by a special education teacher. Two days per week, however, four non-disabled students—children of CMCSS staff—would join the class. (*Id.* ¶¶ 20–23.) A.H.'s parents objected to A.H.'s inclusion in the Pilot Program on the ground that it

was an insufficient substitute for inclusion in a true general education preschool. CMCSS, however, did not offer any alternative option, such as A.H.'s being included in a private general education preschool via IDEA funds. (*Id.* ¶ 26.)

A.H.'s mother contacted Dolly Gerregano, the TDOE's "IDEA 619 Consultant"—"IDEA 619" referring to U.S. Public Law 91-230, Title VI, § 619 (codified as 20 U.S.C. § 1419), the portion of the IDEA involving children ages three to five. A.H.'s mother relayed her concerns about the Pilot Program to Gerregano, and Gerregano responded by agreeing that the Pilot Program was "not legally sufficient." (*Id.* ¶ 28.) Gerregano allegedly told A.H.'s mother that CMCSS had been warned "for years" that it was not compliant with the IDEA's requirements for children in A.H.'s age range, and it was "only a matter of time" before CMCSS would face legal ramifications for its shortcomings. (*Id.*) According to Gerregano, for CMCSS's Pilot Program to satisfy the LRE requirement for students such as A.H., it would need, at a minimum, to be based out of a general education classroom and taught by a general education teacher, and it would need to maintain a ratio of at least one non-disabled child to each disabled child. (*Id.* ¶ 29.)

On June 4, 2018, A.H.'s parents informed CMCSS, in writing, that they considered the Pilot Program an unacceptable option and that A.H. would not be attending. (*Id.* ¶ 31.) In August of 2018, CMCSS responded to A.H.'s parents that, despite the parents' requests, the school district would not be hiring a general education teacher to work with three-year-olds, for budgetary reasons—namely that, because that teacher would not be a special education teacher, CMCSS would be unable to fund the position with federal IDEA dollars. (*Id.* ¶ 33.)

The IEP team met again on August 15, 2018, at which time CMCSS announced "Pilot Program 2" to A.H.'s mother. Pilot Program 2 was based out of St. Bethlehem Elementary School. Like East Montgomery Elementary, St. Bethlehem Elementary provided special education

preschool classes for disabled children ages three to five. St. Bethlehem, however, had also instituted general education preschool for at-risk four-year-olds, as permitted by Tennessee's voluntary public preschool statutes. (*Id.* ¶¶ 34–35.) Under Pilot Program 2, A.H. would be placed in one of the special education classrooms, but CMCSS would select some non-disabled four-year-olds from the general education classroom to spend limited amounts of time in the special education classroom. (*Id.* ¶¶ 38–39.) CMCSS officials proposed an IEP in which A.H. would experience "reverse mainstreaming" via Pilot Program 2. (*Id.* ¶ 40.) "Mainstreaming" is the term used, in the special education field, for placing a disabled child primarily in a general education setting alongside non-disabled peers, while also providing the child necessary additional special education and related services. *See L.H. v. Hamilton Cty. Dep't of Educ.*, 900 F.3d 779, 794 (6th Cir. 2018). "Reverse mainstreaming" is the inverse—placing a student primarily in a special education setting around only disabled peers but providing supplemental exposure to general education and non-disabled students. *See Bd. of Educ. of Centerville City Sch. Dist. v. Bd. of Educ. of the State of Ohio*, No. C-3-92-442, 1993 WL 1318610, at *6 (S.D. Ohio Aug. 24, 1993).

The IDEA requires an LEA to issue parents or guardians a prior written notice, or "PWN," before initiating or changing a child's educational placement, which affords the parents the opportunity to challenge the determination. *See* 20 U.S.C. § 1415(b)(3). On August 15, 2018, CMCSS issued A.H.'s parents a PWN, proposing that A.H. be placed in Pilot Program 2. (Docket No. 1 ¶ 41.) A.H.'s mother conveyed CMCSS's position to Gerregano, who responded critically, writing:

> Reverse mainstreaming—as it is typically called—is a classroom that has mostly children with disabilities and a few/some children without disabilities. I think this is what CMCSS is proposing. This type of classroom is not a regular education classroom and is not by today's standards considered inclusion. Your original draft IEP stated that the Least Restrictive Environment for A.H. is a regular early education childhood classroom. Since CMCSS has already agreed to this LRE, I'm

not sure how they can now want to place A.H. in a special education setting as is listed on the current draft IEP. I believe they would need some data or other strong documentation to change her LRE to a more restrictive placement. . . .

To be an inclusive regular early childhood classroom, the classroom must have an enrollment of at least 50 percent children who do not have a disability (no IEP) and the teacher must be properly endorsed to teach regular early childhood.

(*Id.* ¶ 42.)

A.H.'s parents did not challenge CMCSS's PWN through the IDEA's administrative complaint process. Rather, on August 29, 2018, they filed their Complaint in this case against CMCSS and the State Defendants, pleading claims under the IDEA, Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act ("Title II"), 42 U.S.C. § 12101 et seq. (Docket No. 1 ¶¶ 61–70.) On October 17, 2018, CMCSS filed a Motion to Dismiss (Docket No. 9), and the State Defendants filed their own Motion to Dismiss almost two weeks later (Docket No. 13).

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

### III. ANALYSIS

### A. Exhaustion

The defendants argue first that A.H.'s claims should be dismissed because her parents failed to exhaust the IDEA's administrative procedures. Under the IDEA, the state is required to provide administrative impartial due process hearings for students challenging any matter relating to their receipt of a FAPE, including educational placements and LRE requirements. 20 U.S.C. § 1415(b)(6), (f)–(g), (k). The initial due process hearing may be performed by either the state educational agency ("SEA") or the LEA, but if it is performed by the LEA, a party aggrieved by the LEA's determination can appeal to the SEA. 20 U.S.C. § 1415(f)(1), (g)(1). While the IDEA provides for a private right of action for these matters as well, it requires that plaintiffs first exhaust the administrative procedures. 20 U.S.C. § 1415(i)(2); *see also S.E. v. Grant Cty. Bd. of Educ.*, 544 F.3d 633, 642 (6th Cir. 2008). The Sixth Circuit has held that the rationale behind this exhaustion requirement is that "[t]he federal courts are not the entities best equipped to craft an IEP or remedial substitutes. They are, instead, suited to reviewing detailed administrative records, such as those that would be furnished through due process hearings . . . under the IDEA." *Long v.*

*Dawson Springs Indep. Sch. Dist.*, 197 F. App'x 427, 433–34 (6th Cir. 2006); *see also Fry v. Napoleon Cmty. Schs.*, 788 F.3d 622, 626 (6th Cir. 2015) (observing that the IDEA "calls for highly fact-intensive analysis of a child's disability and her school's ability to accommodate her" and that the administrative exhaustion procedures "ensure that the child's parents and educators, as well as local experts, are first in line to conduct this analysis"), *rev'd on other grounds*, 137 S. Ct. 743 (2017). Claims brought under Title II and Section 504 will also be dismissed for failure to exhaust IDEA procedures if the "gravamen" of the claims is the denial of a FAPE. *Fry*, 137 S. Ct. at 755.

It is undisputed that A.H.'s parents failed to exhaust the IDEA's administrative procedures with regard to her placement in Pilot Program 2. A.H. argues, however, that they were not required to do so, because exhaustion would have been futile in light of the fact that she was challenging a categorical policy of CMCSS—namely, its refusal to provide a FAPE to any disabled child her age in a general education setting. The courts have recognized that the IDEA does not require administrative exhaustion "when it would be futile or inadequate to protect the plaintiff's rights." *Donoho ex rel. Kemp v. Smith Cty. Bd. of Educ.*, 21 F. App'x 293, 297 (6th Cir. 2001) (quoting *Covington v. Knox Cty. Sch. Sys.*, 303 F.3d 912, 917 (6th Cir. 2000); citing *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 873 F.2d 933, 936 (6th Cir. 1989)); *see also Honig v. Doe*, 484 U.S. 305, 327 (1988) (holding that a claim under the predecessor statute to the IDEA could proceed in federal court without prior administrative exhaustion where such exhaustion would be futile); *F.C. v. Tenn. Dep't of Educ.*, 745 F. App'x 605, 608 (6th Cir. 2018) ("But [the exhaustion requirement] is not absolute. There are narrow exceptions to the exhaustion requirement: when the use of administrative procedures would be futile or inadequate to protect the plaintiff's rights and

when the plaintiff was not given full notice of his procedural rights under the IDEA." (citations omitted)).

One of the situations in which exhaustion is often found to have been futile is when a plaintiff was denied a FAPE due to a systemic problem that could not have been remedied by the administrative complaint process. *See D.R. v. Mich. Dep't of Educ.*, No. 16-13694, 2017 WL 4348818, at *3 (E.D. Mich. Sept. 29, 2017) ("Courts have applied the futile or inadequate exceptions to exhaustion when plaintiffs seek relief that is not otherwise available through the administrative process, *i.e.* allegations of structural or systemic failure." (citation and internal quotation marks omitted)); *Jackie S. v. Connelly*, 442 F. Supp. 2d 503, 518 (S.D. Ohio 2006) (collecting cases). Some courts have gone a step further and recognized systemic violations as presenting their own distinct exception to the exhaustion requirement, in addition to the general exception for cases where administrative procedures would have been futile or inadequate. *See, e.g.*, *Urban by Urban v. Jefferson Cty. Sch. Dist. R-1*, 89 F.3d 720, 725 (10th Cir. 1996) (referring to the two as separate exceptions). In recent unpublished cases, however, the Sixth Circuit has stressed that it has not recognized a separate exception to the exhaustion requirement hinging only on the systemic nature of the plaintiff's allegations. *See F.C.*, 745 F. App'x at 609 ("[W]e doubt that a plaintiff is exempt from the IDEA's exhaustion requirement just because he paints the allegations in his complaint as broadly applying to all students."); *W.R. v. Ohio Health Dep't*, 651 F. App'x 514, 521 (6th Cir. 2016) ("[The plaintiff's] claims of systemic violations . . . are subject to the IDEA's exhaustion requirement."). Whether or not systemic violations present a separate exception to the exhaustion requirement, however, the futility exception would apply in any case where the nature of the allegations, alone or in the context of additional facts, rendered seeking administrative relief futile. *See D.R.*, 2017 WL 4348818, at *3.

The defendants in this case—and, to some degree, A.H. herself—treat the determinative issue as whether A.H.'s claims qualify for the "systemic violation exception" to the exhaustion requirement. (*See, e.g.*, Docket No. 14 at 6; *but see* Docket No. 21 at 14.) Regardless of whether one considers such an exception to represent a standalone doctrine, the term is not necessarily a misnomer; "systemic violation exception" might refer to a distinct exception, or it might just refer to one common application of the futility exception. In either event, an exception exists that is at least as broad as an application of the futility exception that takes the systemic nature of the violation into account. After all, there is no reason to think that the futility exception would, for some reason, apply more narrowly in systemic violation cases, and there is ample reason to think that systemic violations are especially likely to present instances where exhaustion would be futile.

The defendants, however, turn this analysis on its head, arguing that a plaintiff seeking to show an exception related to a systemic violation must show *more* than merely that the systemic nature of the allegation rendered exhaustion futile. Specifically, the State Defendants argue that this court, in *T.D. v. Rutherford County Board of Education.*, No. 3:16-CV-1488, 2017 WL 77114 (M.D. Tenn. Jan. 9, 2017), "set forth a two-pronged test" for determining whether the systemic violation exception applies. (Docket No. 14 at 6.) If a plaintiff fails to establish either "prong," the defendants argue, she cannot rely on the systemic nature of the challenged practice to argue that exhaustion would have been futile.

Nothing in the language of the court's opinion in *T.D.*, however, suggests that the court intended the factors discussed to govern every case or to supplant the traditional futility inquiry. Moreover, insofar as the factors identified in *T.D.* are relevant, they favor finding an exception to the exhaustion requirement here, at least based on the facts as alleged. The first factor discussed in *T.D.* and identified by the State Defendants is whether "the claim challenges a systemic policy

or practice that is alleged to inherently violate the IDEA with respect to all students for whom it is applied." *Id.* at *4. The Complaint alleges that CMCSS categorically denies placement in a general education classroom to three- and four-year-olds for whom mainstreaming has been deemed to be appropriate (with the possible exception of those four-year-olds whose families meet the income requirements for placement in the classes for "at-risk" children of that age). (Docket No. 1 ¶¶ 3–5.) The defendants argue that no systemic practice is at issue, because reverse mainstreaming might, in fact, be the LRE appropriate for some children. A.H., however, does not challenge the placement of those children in reverse mainstreaming; she challenges the categorical denial of traditional mainstreaming opportunities.

The second factor discussed in *T.D.* and identified by the State Defendants is whether there is a "need to develop a record regarding the educational needs or IEP of any individual student in order to determine whether . . . a violation has occurred." *T.D.*, 2017 WL 77114, at *4. Of course, some factual record regarding at least one individual student will be necessary to prove that any actionable IDEA violation actually occurred in any case. What this aspect of the *T.D.* analysis addresses, rather, is whether the challenged practice leaves room for individualized variation in outcomes such that one cannot infer that exhaustion would have been futile. The court held that exhaustion was required in *T.D.* because the supposedly systemic challenged policy expressly left room for individualized determinations, rather than simply ordering a "blanket denial of services." *Id.* Here, what is challenged is precisely a blanket denial of services, specifically a blanket denial of traditional mainstreaming to pre-kindergarten students.

The court returns to the core of the issues raised, futility of exhaustion. At least as alleged in the Complaint, it would have been futile for A.H. to exhaust her administrative remedies. As A.H. describes the events, CMCSS never took the position that some three-year-olds could be put

in a general education preschool but that A.H. would not be for some case-specific reason; CMCSS's position was that no three-year-old would be placed in a general education preschool, regardless of her educational needs. A.H.'s IEP team had already established, at the time of her initial draft IEP, that a general education setting would be appropriate for her. Indeed, CMCSS, in working with A.H.'s parents, does not appear to have ever disputed that, if a general education preschool classroom had been available, it would have been an appropriate placement for A.H. and would have satisfied the LRE requirement. (*See* Docket No. 1 ¶ 34 (quoting unidentified person speaking on behalf of CMCSS with saying, "We don't have a general education setting for a three-year-old. If we did, we wouldn't have this problem.").) The only obstacle was CMCSS's simple refusal to make that option available to anyone, regardless of need.

A.H.'s parents, moreover, had been informed that the state was aware of CMCSS's alleged noncompliance and had allowed it to continue for years. (*Id.* ¶ 7.) It is difficult, then, to see what A.H. could have accomplished with an administrative complaint or appeal. Her denial of a FAPE in her LRE was the result of a categorical policy that CMCSS refused to revisit and the state had failed, for years, to correct. Those facts are sufficient to confirm that A.H.'s exhaustion of remedies would have been futile. The court, therefore, will not dismiss A.H.'s claim for failure to exhaust, at least based on the facts as stated in the Complaint. If facts later reveal that CMCSS's position was not the categorical bar that A.H. has claimed or that an administrative complaint would have offered a legitimate prospect of ending the state's toleration of CMCSS's policies, the defendants can raise the exhaustion defense again at a later juncture.

**B. Refusal of Services**

The defendants argue next that A.H.'s claims should be dismissed because her parents did not consent to services under the IDEA and the defendants, therefore, have no obligation to provide

A.H. with a FAPE. The IDEA provides that "[a]n agency that is responsible for making a free appropriate public education available to a child with a disability under this subchapter shall seek to obtain informed consent from the parent of such child before providing special education and related services to the child." 20 U.S.C. § 1414(a)(1)(D)(i)(II). "If the parent of such child refuses to consent to services . . . , the local educational agency shall not provide special education and related services to the child" within the IDEA framework, and the agency "shall not be considered to be in violation of the requirement to make available a free appropriate public education to the child." 20 U.S.C. § 1414(a)(1)(D)(ii)(II), (III). The agency is similarly exempt from liability if "the parent fails to respond to a request to provide such consent." 20 U.S.C. § 1414(a)(1)(D)(ii)(III). The defendants argue that, because A.H.'s parents never agreed to any proposed IEP, they did not consent to services under the IDEA and therefore have no right to sue for a FAPE. The defendants do not contend that A.H.'s parents were required to accept a proposed IEP in its entirety to preserve their rights under the Act but, rather, suggest that the parents had to, at a minimum, "agree[] to implement parts of the IEP" while reserving their objections about others. (Docket No. 14 at 4.)

Both the State Defendants and CMCSS initially characterize A.H.'s parents' actions as a refusal to consent to services under the IDEA. (Docket No. 10 at 2; *accord* Docket No. 14 at 4.) Nothing in the facts set forth in the Complaint, however, paints a picture that any reasonable observer could construe as the parents' affirmative refusal to consent to CMCSS's provision of special education and related services to A.H. altogether. To the contrary, A.H.'s parents zealously pursued those services and walked away from the process only when the parties had reached an impasse on the fundamental question of what kind of classroom A.H. would be placed into. The subject on which the parties disagreed, moreover, was not some minor detail that could have been set aside while A.H.'s education proceeded in every other regard. A.H.'s parents did not consent

to what CMCSS offered because they believed that the very framework in which the services would be provided was fatally flawed. None of the defendants has identified any basis for treating that decision as a refusal to consent to services altogether. The court will not dismiss the claims on that ground.

In their Reply, the State Defendants pivot to arguing that "[w]hether [A.H.'s] parents *refused* consent is not the issue—it is whether they gave informed consent to the LEA to initially provide special education and related services." (Docket No. 28 at 3.) In support of that contention, they cite 20 U.S.C. § 1414(a)(1)(D)(i)(II) and 34 C.F.R. § 300.300(b)(1). Those provisions, however, merely address an educational agency's duty to seek consent and not to go forward with a special education plan without it. The cited provisions do not discuss the situations in which a parent's lack of consent relieves the agency of its obligation to provide a FAPE altogether. Rather, that issue is addressed explicitly in two other statutory subsections, 20 U.S.C. § 1414(a)(1)(D)(ii)(II) and 20 U.S.C. §1414(a)(1)(D)(ii)(III). Section (D)(ii)(II) provides that an agency is relieved of its obligation to provide a FAPE only "[i]f the parent of such child *refuses to consent to services*." 20 U.S.C. § 1414(a)(1)(D)(ii)(II) (emphasis added). Section (D)(ii)(III) states that an LEA will not be liable for an IDEA violation "[i]f the parent of such child *refuses to consent to the receipt of special education and related services*, or the parent *fails to respond to a request to provide such consent*." 20 U.S.C. § 1414(a)(1)(D)(ii)(III) (emphasis added). The U.S. Department of Education's IDEA regulations mirror that formulation, providing than an agency "[w]ill not be considered to be in violation of the requirement to make [a] FAPE available to the child" "[i]f the parent of a child *fails to respond* to a request for, or *refuses to consent to*, the initial provision of special education and related services." 34 C.F.R. § 300.300(b)(3) (emphasis added).

In other words, the argument that refusal of consent "is not the issue" is belied by the actual statutory and regulatory provisions directly on point, which state unambiguously that refusal of consent very much *is* the issue. The only other situation in which a lack of consent would wholly excuse an agency of its obligation to provide a FAPE would be if a parent failed to respond to the agency's efforts to obtain consent. A.H.'s parents, though, did not refuse to consent to services or fail to respond; they just disagreed with a core aspect of the plan offered. There is no basis in the text of the IDEA or its accompanying regulations for construing that disagreement as relieving the agencies of their responsibilities to ensure that A.H. received a FAPE.

The regulations also clarify, if there was any remaining doubt, that "[a] public agency may not use a parent's refusal to consent to *one service or activity* . . . to deny the parent or child *any other service, benefit, or activity* of the public agency," unless required by the IDEA and its regulations. 34 C.F.R. § 300.300(d)(3) (emphasis added). Consent, the statute and regulations recognize, can occur at different levels of specificity. A parent may, for example, consent to the provision of special education and related services but oppose some component of the school's proposed methods. An educational agency is shielded from liability only where "the parent . . . refuses to consent *to the receipt of special education and related services*, or the parent fails to respond to a request to provide such consent." 20 U.S.C. § 1414(a)(1)(D)(ii)(III). That is, the educational agency is relieved of its obligation to provide a FAPE if the parent or guardian rejects the proposition that the child should be provided special education or related services *at all*. Nothing in the IDEA shields an agency in a case where parents agree that their child is entitled to services but refuse to consent to the way in which the agency wishes to provide them.

The defendants' interpretation of how consent functions under the IDEA, moreover, would be plainly contrary to the purposes of the Act, because it would reward school systems for offering

inferior services that they know parents will refuse. An educational agency could offer a child's parent or guardian an IEP in which the child received services in a patently unacceptable setting—for example, by an untrained instructor in an otherwise abandoned schoolhouse—and, if the parents refused, as any reasonable parent would, the agency and the state would, by the defendants' interpretation, be relieved of any obligation to provide that child a FAPE—possibly for the next eighteen years. Congress did not intend that result, and the actual language it adopted confirms that it did not intend that result. The court will not dismiss A.H.'s claims based on a lack of consent to services.

## C. "Legislative Immunity"

CMCSS argues next that the claims against it are barred by legislative immunity. "Legislative immunity" typically refers to the absolute immunity afforded to legislators and legislative bodies "when they act in their legislative capacities." *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 437 (6th Cir. 2005) (quoting *Shoultes v. Laidlaw*, 886 F.2d 114, 117 (6th Cir.1989)). CMCSS does not argue that it is entitled to immunity pursuant to that principle, but that A.H.'s claims impermissibly intrude on the immunity enjoyed by the Tennessee General Assembly, which is not a party to the case. (Docket No. 10 at 5.) What CMCSS sets forth is not really an argument based on principles of legislative immunity, but more of a general appeal to principles of federalism and state sovereignty. The State of Tennessee, CMCSS argues, has chosen not to create a system of universal public general education preschools, so holding that A.H. is entitled to placement in a general education class would impermissibly encroach on the state's autonomy.

CMCSS's argument fails for at least two reasons. First, CMCSS is mistaken that A.H. is suing to force the State of Tennessee to create a system of universal public general education

preschools. She is simply suing based on her own claimed right to be placed in some form of general education preschool setting or the equivalent thereof. She posits that her needs could be met by, for example, her being placed in a private preschool. She also suggests that her needs might be met by including her in an elementary school classroom, placing her in a Head Start program, or providing home-based services. (Docket No. 18 at 2.) In other words, A.H. is not seeking the alleged encroachment that CMCSS fears.

Second, CMCSS's assumption that requiring the state to comply with the IDEA would conflict with the state's legislative prerogatives ignores the fact that the IDEA is a voluntary program that the State of Tennessee joined of its own accord. The very nature of a federal conditional spending program is that it is freely entered into, "much in the nature of a contract." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). A state is always free to choose the option of "'not yielding' to federal blandishments when [it does] not want to embrace the federal policies as [its] own." *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 579 (2012) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923)). If the IDEA or some other spending program in which Tennessee participated did require the State to adopt universal pre-kindergarten—which A.H. agrees is not currently the case—then that requirement would involve no impermissible encroachment on the state's autonomy, as long as the program met the minimum standards for the constitutionality of a conditional grant to states. *See NFIB*, 567 U.S. at 580–81. If Tennessee does not want to adopt some policy mandated by the IDEA or another federal program, the state's recourse is clear: turn the money down. Unless it takes that step, the state and its school districts have no right to expect the courts to give the state back the discretion that it voluntarily bargained away.

Whatever doctrine to which one pegs CMCSS's argument—legislative immunity, general federalism principles, or something else—the argument itself is without merit. Nothing in A.H.'s Complaint, and nothing about requiring IDEA compliance generally, runs afoul of the sovereignty or legislative prerogatives of the State of Tennessee. The court will not dismiss A.H.'s claims on that ground.

## D. Causes of Action Against State Educational Agencies under the IDEA

Finally, the State Defendants argue that, even if A.H. has pleaded a viable cause of action against CMCSS, the court should dismiss the claims against the State Defendants because the IDEA does not create a cause of action against SEAs for their failures of monitoring and oversight. The State Defendants do not argue—nor could they plausibly argue—that the state agencies lack obligations under the Act. Under the express terms of the IDEA, "[t]he State educational agency is responsible for ensuring that . . . the requirements of [the IDEA's state grant program] are met," and "all educational programs for children with disabilities in the State, including all such programs administered by any . . . local agency . . . are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities." 20 U.S.C. § 1412(a)(11)(A); *see also Ullmo ex rel. Ullmo v. Gilmour Acad.*, 273 F.3d 671, 679 (6th Cir. 2001) ("Under the IDEA, the responsibility for ensuring that disabled students receive a free appropriate public education lies with the state educational agency (SEA)."). The state is not merely a pass-through entity directing funds to LEAs. An SEA has express implementation, monitoring and oversight obligations, 20 U.S.C. § 1416; it cannot merely disburse funds "and then wait[] for the phone to ring." *Cordero by Bates v. Penn. Dep't of Educ.*, 795 F. Supp. 1352, 1362 (M.D. Pa. 1992). The State Defendants argue, nevertheless, that, when they fail in those

responsibilities and their failure leads to a child's being denied a FAPE, the child is limited to suing her LEA.

Numerous courts have rejected that argument, including this one. *See, e.g., Pachl v. Seagren*, 453 F.3d 1064, 1070 (8th Cir. 2006) ("[O]ur court has suggested that 'systemic violation' of the State's responsibilities under the IDEA might give rise to state liability."); *St. Tammany Par. Sch. Bd. v. State of La.*, 142 F.3d 776, 784 (5th Cir. 1998) ("[B]oth the language and the structure of IDEA suggest that either or both [the SEA and LEA] may be held liable for the failure to provide a free appropriate public education, as the district court deems appropriate after considering all relevant factors." (citation omitted)); *Gadsby ex rel. Gadsby v. Grasmick*, 109 F.3d 940, 953 (4th Cir. 1997) ("[T]he SEA is ultimately responsible for the provision of a free appropriate public education to all of its students and may be held liable for the state's failure to assure compliance with [the] IDEA."); *S.P. v. Knox Cty. Bd. of Educ.*, 329 F. Supp. 3d 584, 594 (E.D. Tenn. 2018) ("TDOE, as the state educational authority, is responsible for ensuring that the requirements of the IDEA are carried out. . . . Because there are material issues of fact whether TDOE carried out its duties under the IDEA, its motion for summary judgment is denied."); *J.M. v. Dickson Cty. Sch. Dist.*, No. 3:17-cv-00405, Docket No. 31 at 10 (M.D. Tenn. Dec. 14, 2017) ("Th[e]se systemic, state-level failures are relevant not only to [the child's] past deprivations but whether he can expect, with any confidence, to receive a FAPE going forward. The State Defendants are therefore appropriate parties to the case . . . ."); *Morgan Hill Concerned Parents Ass'n v. California Dep't of Educ.*, 258 F. Supp. 3d 1114, 1125 (E.D. Cal. 2017) (noting that the IDEA's "choice of words suggests Congress . . . anticipated private suits in response to statewide, systemic failures in the education of students with disabilities"); *Kalliope R. ex rel. Irene D. v. N.Y. State Dep't of Educ.*, 827 F. Supp. 2d 130, 141 n.3 (E.D.N.Y. 2010) (noting that the state

educational agency "is a proper defendant in this action, which challenges a [state] policy that allegedly interferes with the IEP development process for disabled students in a systemic manner"); *Fetto v. Sergi*, 181 F. Supp. 2d 53, 72 (D. Conn. 2001) ("The state education agency is a proper party to actions involving claims of systemic violations of the IDEA . . . ."); *Corey H. v. Bd. of Educ. of City of Chicago*, 995 F. Supp. 900, 913 (N.D. Ill. 1998) ("[C]ourts have found that the state educational agency is responsible for a local school district's systematic failure to comply with an IDEA mandate."). The court remains unpersuaded.

The State Defendants insist that the question here is whether the IDEA includes an implied cause of action against them. (Docket No. 14 at 9.) But the cause of action against an educational agency under the IDEA for denial of a FAPE is not implied; it is express. Pursuant to 20 U.S.C. § 1415(i)(2)(A), "[a]ny party aggrieved by the findings and decision made under" the IDEA's complaint procedures[4] "shall have the right to bring a civil action with respect to the complaint presented . . . , which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy." *Id.* Nothing in 20 U.S.C. § 1415(i)(2)(A) limits the cause of action created to complaints against LEAs, and it would be strange if it did, given the IDEA's clear contemplation that both LEAs *and* SEAs will have duties under the Act, with the SEA bearing the ultimate responsibility for compliance. The State Defendants have simply read an exception into 20 U.S.C. § 1415(i)(2)(A) that does not exist, then argued that the court must find an implied cause of action to get around that exception. There is no need to do so. The court will simply read the statute as written, with no limitation on which culpable educational agency an aggrieved child can sue.

---

[4] As the court has discussed, the Sixth Circuit has construed this provision as extending to cases where the plaintiff did not go through the technicality of seeking and receiving an administrative determination when doing so would have been futile. *See Covington*, 205 F.3d at 917.

According to A.H., TDOE was aware of the potential legal problems surrounding CMCSS's practices but allowed those practices to continue for years. The State Defendants' oversight responsibilities are, therefore, plainly implicated by A.H.'s allegations. Moreover, the fact that CMCSS does not operate any schools adequate to provide A.H. with an education in her appropriate LRE leaves open the possibility that the State Defendants may play a role in providing a remedy, should A.H. succeed in establishing an IDEA violation. The court, therefore, will not dismiss the claims against the State Defendants.

### IV. CONCLUSION

For the foregoing reasons, the Motion to Dismiss filed by CMCSS (Docket No. 9) and the Motion to Dismiss filed by the State Defendants (Docket No. 13) will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge